IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CTI SYSTEMS, S.A.,

                Plaintiff,

v.

GLOBAL FINISHING SOLUTIONS, LLC,

                Defendant.

OPINION & ORDER

14-cv-744-jdp

---

This is a contract dispute arising from the construction of a paint and powder-coating workshop inside a factory in Kansas. Plaintiff CTI Systems, S.A. had been engaged by the owner of the factory (not a party to this suit) to construct the workshop. CTI sub-contracted to defendant Global Finishing Solutions, LLC the task of constructing an environmental room, or EV room, which is the temperature- and humidity-controlled enclosure in which powder coating would be performed. CTI provided the technical specifications for the EV room. Notably, those specifications included that the ambient temperature in the factory would range from 55 to 110 degrees Fahrenheit. Global Finishing built and delivered an EV room. But the HVAC system for the EV room failed because the air handling units that Global Finishing selected and installed overheated. After Global Finishing refused to fix the problem, CTI installed a new HVAC system at a cost of nearly $400,000.

CTI filed suit in this court, alleging breach of contract and breach of warranty, and it now moves for summary judgment. Dkt. 31. The court will deny the motion for summary judgment. The parties' contract did not specify who would be responsible for maintaining the ambient temperature in the factory, and there are disputes of fact concerning who was responsible for managing the substantial heat produced by the EV room's HVAC system.

CTI also moves to strike Global Finishing's expert's report. Dkt. 47. This court strictly enforces its expert disclosure deadlines, and it will grant CTI's motion because the report of Global Finishing's expert was untimely. The court will also strike the supplemental report of CTI's expert, because it, too, was untimely.

UNDISPUTED FACTS

Except where noted, the following facts are material and undisputed.

AGCO Corporation—not a party to this suit—hired CTI to construct a paint workshop at AGCO's facility in Hesston, Kansas. CTI is a Luxembourg corporation with its principal place of business in Lentzweiler, G.D. Luxembourg. The project required constructing an EV room, which AGCO would use to prepare metal parts for a powder coating process. CTI contracted this part of the project out to Global Finishing, a Wisconsin company with expertise in EV room installations. Global Finishing is a limited liability company, and its only member is a Delaware corporation that has its principal place of business in Crystal Lake, Illinois.

CTI provided Global Finishing with specifications for the EV room, and Global Finishing responded by submitting a quote. One of the issues that the parties discussed before finalizing their agreement was the placement of the air handling units that would be part of the EV room's HVAC system. Global Finishing's initial quotes indicated that the air handling units would be mounted on the roof of AGCO's facility. CTI rejected this proposal, indicating that it wanted the air handling units to be installed inside the facility (but outside the EV room). CTI's plan was to use the heat that the air handling units generated to help cure parts in other locations at the facility. Global Finishing balked at this idea, explaining

that the air handling units would create a great deal of heat. CTI insisted on a design that had the air handling units inside the facility, and Global Finishing eventually submitted a quote for such a design. CTI accepted the quote, and the parties signed a contract on July 17, 2012.

The parties incorporated a technical specification for the EV room into their contract, which provided that CTI and AGCO would supply only a power supply point, water, and a drain; Global Finishing was responsible for providing all other equipment and installation materials. Two provisions in the technical specification are pertinent to this case. The first pertinent provision requires that the HVAC system be placed outside the EV room itself, but inside the manufacturing building:

> **3. HVAC units**
>
> The HVAC units are equipped with all necessary equipment to meet the climate conditions described in the Performance criteria/ local conditions in KS. The heating and de-humidification should be done electrically. The units are installed on a steel structure[] outside of the EV-room, but inside of the building. The access to the platform to be considered accordingly in order to do the maintenance work required.

Dkt. 8-2, § 3.

The second pertinent provision in the specification concerns the environment around the EV room and the heat loads to be managed:

> **5. Process/Environmental Parameter**
>
> Heat loads to be considered
>
> - Powder booth grey            275.000 BTU/hour
> - Powder booth black           275.000 BTU/hour
> - Powder booth multicolor      350.000 BTU/hour
>
> - 3 ware loads at the time

3

    Velocity Load:    0,1-4 m/min
    Weight Load:    2200 pounds per ware load
    Surface:    300 sqft, p

  Approx. Temperature Metal entering Room:  Temperature 122°F

- heat load of 2 operators in the booth
- heat load of lighting
- heat load because of the room design (wall, doors,..)

Climatic condition outside the EV Room

Temperature Inside: min. 55°F
        [m]ax. 110°F

Humidity:  min. 20%
     max. 99.7%

*Id.* § 5.

  The contract did not specify the model of air handling units to be installed, leaving that decision to Global Finishing. Based on the recommendation of Global Finishing's supplier—WHESCO Group, Inc.—Global Finishing purchased and installed three Carrier brand rooftop units. The units had a maximum operating temperature of 115°F, and each unit had a label stating that it was suitable for outdoor use only. There is evidence that CTI told Global Finishing or WHESCO personnel that CTI had successfully used other outdoor units indoors before. *See, e.g.*, Dkt. 23 (Parish Dep. 25:9-27:22). And one of Global Finishing's sales managers recalled seeing an email from Carrier, to either WHESCO or to Global Finishing, indicating that the units that Global Finishing had selected would work indoors, even though they were labeled for outdoor use only. Dkt. 27 (Huth Dep. 30:4-9). But the specifics of these communications remain in dispute.

  In August 2012, about a month after the parties had agreed to the specifications and entered into their contract, one of Global Finishing's project managers sent concept designs

4

for the EV room to CTI personnel via email. In the email, Global Finishing's project manager flagged the issue of managing the heat from the air handling units:

> We will have to look at CTI/AGCO expectations on performance with keeping the Air Handling Units (AHU) indoors. They are rated at operating at a maximum of 115F and without the proper external building ventilation or conditioning, these units could create higher temperatures than that when trying to cool the room on hot summer days. GFS will provide the design at CTI's request, but note that it is the design responsibility of CTI/AGCO to keep the ambient temperatures in this area around the AHU below the maximum design temperatures to achieve proper performance.

Dkt. 44-12, at 2. About a month later, the same project manager emailed CTI's project manager and again expressed concerns over the heat that the air handling units would create:

> After looking at the maximum heat loads CTI provided in your specification, the air handling units would generate up to 1,200,000 BTU/hr of heat above the EV Room. Note that your specification also states that the maximum ambient temperatures inside the building will be controlled to a maximum of 110F. I expect this could be a problem if there's no plan to remove heat from that area. Also, please confirm the release temperatures of the sprinklers in that area.

Dkt. 44-13, at 2. Despite these communications, CTI did not take steps to make sure that the airflow or temperature around the air handling units would be controlled.

Global Finishing delivered a completed EV room, and CTI paid Global Finishing in full. But after AGCO began using the EV room, CTI learned that the air handling units were not working properly. The problems included high pressure alarms (which disabled the units), oil leaks, powder in the cooling fins, ambient temperatures that exceeded the units' maximum operating temperature, and condensation system leaks. A Carrier representative visited the AGCO facility in August 2013, and he determined that the air handling units were recirculating condenser air and that the temperature around the units was 159°F. At Global

5

Finishing's request, WHESCO contacted the distributor that sold the air handling units. The distributor indicated that indoor installation was a misapplication.

CTI asked Global Finishing to fix the problem, but Global Finishing refused to do so without compensation. CTI undertook the repair itself, eventually installing air handling units outside the facility, at a cost of $394,320.91. When Global Finishing refused to reimburse CTI for these expenses, CTI filed suit in this court alleging state law claims for breach of contract and breach of warranty.

The court has subject matter jurisdiction over this case under 28 U.S.C. § 1332, because the parties are completely diverse and the amount in controversy exceeds $75,000.

ANALYSIS

Before the court are CTI's motion for summary judgment, Dkt. 31, and CTI's motion to strike Global Finishing's expert's report, Dkt. 47. The court will address the motion to strike first, as this motion will affect the summary judgment record.

**A. CTI's motion to strike**

The court will grant CTI's motion to strike Global Finishing's expert's report. The Preliminary Pretrial Conference Order established deadlines by which the parties needed to disclose their experts in this case, although it permitted the parties to modify these deadlines by agreement. Dkt. 11, at 2. On June 24, 2015, the parties filed a joint motion to modify the schedule, proposing to adjust the deadlines for expert disclosures and for dispositive motions. Dkt. 19. The court granted the motion, and based on the parties' stipulation, all proponent expert reports in this case were due on August 3, 2015, and all responsive reports were due on September 25, 2015.

6

CTI's expert is Daniel McGinnis, and CTI timely delivered his first report to Global Finishing on August 3. Global Finishing did not prepare an opening expert report. McGinnis supplemented his report—albeit improperly, which is an issue that the court will discuss below—on October 16, 2015. Dkt. 30. About a month later, Global Finishing filed its "Rule 26(a)(2)(C) Disclosures," purporting to summarize the testimony of its non-retained expert, Mark Parish, a vice president at WHESCO who was working with Global Finishing on the project. Dkt. 37. CTI has moved to strike Parish's disclosure and to prevent him from testifying at trial as an expert. Under Federal Rule of Civil Procedure 37(c)(1), these sanctions are "automatic and mandatory . . . unless [the] non-disclosure was justified or harmless." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004). After reviewing Global Finishing's explanations for its delay, the court is not convinced that the late report was justified or harmless. The court will therefore grant CTI's motion to strike.

Global Finishing offers several justifications for its delayed disclosure, none of which are persuasive. For example, Global Finishing argues that there was a "flurry of activity on this file" between CTI's initial expert disclosure and Global Finishing's responsive expert disclosure. Dkt. 57, at 4. The parties conducted international depositions via video conferencing, briefed summary judgment, and produced thousands of documents. But that is all par for the course in federal litigation: the fact that a deadline falls during a busy time in a case does not justify failing to meet that deadline. Likewise, Global Finishing argues that Parish is not a "retained" expert, and so the company could not have known what Parish's opinions were until CTI took his deposition on October 9, 2015. *Id.* This, too, is a poor excuse. Retained or not, there was nothing preventing Global Finishing from ascertaining Parish's opinions before his deposition and preparing a timely expert report. Finally, Global

7

Finishing argues that Parish's report responds to the new opinions in McGinnis's supplemental report. And because Parish's report was within 30 days of the supplemental report, it was not late. *Id.* at 4-5. But the proper deadline for Global Finishing's responsive report was tied to CTI's *initial* disclosure, not to any supplemental reports, and Global Finishing missed the responsive deadline by a month and a half. Global Finishing has not provided a substantial justification for failing to timely disclose Parish's expert report.

Global Finishing also contends that its delayed disclosure was harmless, relying on four factors that the Seventh Circuit has endorsed: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir.), *as amended*, (Feb. 2, 2012). For example, Global Finishing argues that Parish's expert report simply used his deposition testimony to craft a statement that refuted the specific opinions in CTI's expert's report. And CTI deposed Parish, so it was therefore aware of his opinions as early as October 9, 2015. Moreover, discovery will not close until January 29, 2015, so there is still time for CTI to depose Parish again and explore his opinions. Global Finishing also asserts that it had no ill motive in failing to comply with the court's deadlines. In the company's words: "[u]nfortunately, the torrid pace of the litigation, the amount of discovery that was necessary[,] and the time frame between the plaintiff's disclosure and the time to disclose by the defendant created the delay." Dkt. 57, at 7.

The court does not share Global Finishing's appraisal of the harm that its delayed disclosure would cause. CTI organized its strategy around the reasonable assumption that Global Finishing would not rely on expert witnesses in this case. Indeed, CTI deposed Parish

8

as a *fact* witness, not as an expert witness. CTI also presented its summary judgment motion based, in part, on Global Finishing's failure to respond to McGinnis's expert opinions. Forcing CTI to prepare for and conduct a new deposition as it is preparing for trial—and an expert deposition at that—is no small hardship. *See Musser*, 356 F.3d at 759 (affirming the district court's finding of harm based on a party being denied the opportunity to question a witness in his expert capacity). Global Finishing's proposed solution merely shifts its inconvenience to CTI: because Global Finishing could not prepare a timely expert report during a busy time in the litigation, CTI should now scramble to re-organize its case and conduct an expert witness deposition before trial. That is not a fair solution and it does not render Global Finishing's belated disclosure harmless. *See Finwall v. City of Chicago*, 239 F.R.D. 494, 501 (N.D. Ill.), *objections overruled*, 239 F.R.D. 504 (N.D. Ill. 2006) ("Late disclosure is not harmless within the meaning of Rule 37 simply because there is time to reopen discovery.").

The purpose of setting and enforcing deadlines for expert disclosures is to allow the parties ample time to prepare their cases, present issues for summary judgment, and plan trial strategies. Global Finishing's proposed solution would undermine each of these goals. Under Rule 37(c)(1), the court will exclude Parish from testifying as an expert at trial because Global Finishing's failure to timely disclose him as an expert was neither substantially justified nor harmless.

But this brings the court to McGinnis's second report. Under Rule 26(e)(1)(A), an expert may supplement his report if he discovers that it is "incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." As the Preliminary Pretrial Conference Order

9

stated, supplementation is limited "to matters raised in an expert's first report." Dkt. 11, at 2. This court permits experts to supplement their reports "to correct mistakes and oversights, *not* to include new examples and illustrations that could have been included in an original expert report." *Innogenetics N.V. v. Abbott Labs.*, No. 05-cv-0575, 2006 WL 6000791, at *2 (W.D. Wis. Aug. 3, 2006) (emphasis added). Parties may not use supplemental reports to "beef up" an expert's initial opinions or to add new support for those opinions. Such maneuvers would counteract the very purpose of Rule 26(a)(2), which is to give parties full and fair notice of an expert's opinions early enough in a case to allow them time to plan their strategies accordingly.

McGinnis's second report reviews new documents and explains how they reinforce his earlier conclusions about whether Global Finishing complied with professional codes and manufacturer instructions when selecting and installing the air handling units for the EV room. Dkt. 30, at 2 and Dkt. 34, ¶ 4. These additions go beyond the scope allowed under Rule 26(e) and are not proper supplemental material. The court will therefore strike McGinnis's second report. As a result, the court will not rely on McGinnis's second report in reviewing CTI's motion for summary judgment, and McGinnis's trial testimony will be limited to the opinions that he disclosed in his timely first report.

**B. CTI's motion for summary judgment**

CTI moves for summary judgment on its breach of contract and breach of warranty claims. Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v.*

10

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* A party may not simply rely on the allegations in its pleadings to create such a dispute, but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [its] favor." *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).

Before addressing the merits of the case, the court must resolve Global Finishing's procedural opposition to CTI's motion for summary judgment. Through counsel, Global Finishing has indicated that it has not yet deposed McGinnis and therefore cannot adequately respond to CTI's motion. Dkt. 42, at 4 and Dkt. 44, ¶ 6. Because Global Finishing has not been able to depose McGinnis "to assess his qualifications as an expert witness, the foundation of his opinions, and his conclusions," the company contends that the court should deny summary judgment under Rule 56(d). Dkt. 42, at 4.

Global Finishing has not demonstrated that it is entitled to relief under Rule 56(d). McGinnis provided his expert report on August 3, 2015, more than three months before Global Finishing's opposition to CTI's motion for summary judgment was due. Global Finishing had adequate time to conduct a deposition before opposing summary judgment—or to at least schedule one and then move the court to defer ruling on CTI's motion. Yet as of November 30, 2015, Global Finishing had not even attempted to arrange a deposition for McGinnis. Dkt. 55, ¶ 2. Global Finishing has not suggested that CTI was uncooperative in scheduling a deposition, nor has Global Finishing provided an explanation for failing to timely depose its opponent's only expert witness. Thus, Global Finishing's predicament appears to be one entirely of its own making. "Where a party's own lack of diligence is to blame for that party's failure to secure discoverable information, it is not an abuse of

11

discretion to deny a Rule 56(f) motion." *Grayson v. O'Neill*, 308 F.3d 808, 816 (7th Cir. 2002).[1] Global Finishing therefore cannot use Rule 56(d) to oppose CTI's motion for summary judgment.

### 1. CTI's breach of contract claims

CTI contends that Global Finishing breached the parties' contract in two ways. First, Global Finishing failed to provide an HVAC system that would maintain the required climate conditions in the EV room because the air handling units shut off due to overheating. Second, Global Finishing installed air handling units that did not comply with all relevant regulations and professional standards, or with Carrier's installation instructions. Global Finishing disagrees on both counts, contending that it manufactured the EV room according to the specifications in the contract and even alerted CTI to its misgivings about the heat that the air handling units would create. With regard to CTI's first claim, the parties' contract is ambiguous as to who would be responsible for maintaining the ambient temperatures in the AGCO facility and for dealing with the heat produced by the EV room's own HVAC system. Summary judgment on this claim is therefore inappropriate. With regard to the second claim, CTI has not demonstrated that Global Finishing's failure to comply with Carrier's installation instructions independently caused any damages. The court will therefore deny CTI's motion for summary judgment on its breach of contract claims.

The contract at issue in this case provides that it is governed by Wisconsin law. Dkt. 8-1, § 29. To succeed on a breach of contract claim under Wisconsin law, CTI must demonstrate: "(1) the existence of a contract creating obligations flowing from [Global

---

[1] The 2010 amendments to the Federal Rules of Civil Procedure moved the provisions of Rule 56(f) into Rule 56(d).

Finishing] to [CTI]; (2) a breach of those obligations; and (3) damages from the breach." *Uebelacker v. Paula Allen Holdings, Inc.*, 464 F. Supp. 2d 791, 801 (W.D. Wis. 2006) (citing *Nw. Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 187 N.W.2d 200, 203 (1971)). The parties do not dispute that they entered into a valid contract. Thus, the outcome of this case depends on the interpretation of the parties' obligations under the contract and whether Global Finishing's alleged breaches of that contract damaged CTI.

"The primary goal in contract interpretation is to give effect to the parties' intent, as expressed in the contractual language." *Md. Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶ 22, 326 Wis. 2d 300, 786 N.W.2d 15 (internal citations and quotation marks omitted). When a contract's terms are clear and unambiguous, the court construes the contract as written. *Id.* ¶ 23. But when the language of a contract is ambiguous, it may be necessary to consider extrinsic evidence to determine the parties' intent. *Id.*

Beginning with CTI's first claim, the critical issue is whether the parties' contract is ambiguous as to who would maintain the ambient temperature around the air handling units. "A contract provision is ambiguous if it is fairly susceptible of more than one construction." *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 2015 WI 65, ¶ 36, 363 Wis. 2d 699, 866 N.W.2d 679 (internal citations and quotation marks omitted). Whether a contract is ambiguous is a question of law, for the court to answer. *Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co.*, 2000 WI 26, ¶ 24, 233 Wis. 2d 314, 607 N.W.2d 276.

CTI contends that the contract and specification, together, unambiguously required Global Finishing to account for the HVAC system's effect on the ambient temperatures in the AGCO facility. The specification, taken as a whole, could support CTI's interpretation: based on the language of the specification, the parties could have intended that Global

13

Finishing would account for any heat that its HVAC system added to the climate inside the facility. But that is not the *only* fair construction. The relevant section of the specification simply provided a range of temperatures that would occur inside the facility and required Global Finishing to manufacture an HVAC system that could adequately manage the conditions inside the EV room while operating within that range. There was no provision indicating who would be responsible for maintaining the climate inside the facility. Thus, there are at least two reasonable ways to interpret the intent behind the provision that provided the range of operating temperatures, and so the contract is ambiguous on this point.

With an ambiguous contract, the court turns to extrinsic evidence to determine the parties' intent. Relevant extrinsic evidence includes the conduct of the parties, the negotiations that occurred before and after the parties executed the contract, and all related documents. *DeWitt Ross & Stevens, S.C. v. Galaxy Gaming & Racing Ltd. P'ship*, 2004 WI 92, ¶ 46, 273 Wis. 2d 577, 682 N.W.2d 839. "When a contract provision is ambiguous, and therefore must be construed by the use of extrinsic evidence, the question is one of contract interpretation for the jury." *Mgmt. Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 557 N.W.2d 67, 75 (1996). Because the court does not decide questions of fact at the summary judgment stage, disputes regarding the credibility of the extrinsic evidence, or regarding which inferences to draw from that evidence, would preclude granting a motion for summary judgment. *See N. Crossarm Co. v. Chem. Specialties, Inc.*, No. 03-cv-415, 2004 WL 602648, at *8 (W.D. Wis. Mar. 16, 2004), *amended sub nom. N. Crossarm Co. v. Chem. Specialities, Inc.*, No. 03-cv-415, 2004 WL 725024 (W.D. Wis. Mar. 29, 2004). Thus, Global Finishing can defeat summary judgment by adducing evidence that creates a genuine dispute as to what the parties intended when they drafted the relevant portions of the specification.

Based on the evidence of record, the court concludes that Global Finishing has raised a genuine dispute of material fact.

There is evidence in the record that Global Finishing made CTI aware of the heat issue before the parties signed the contract. Global Finishing's initial designs had the air handling units on the roof of the facility, and CTI rejected these designs because it wanted to use the heat help cure parts. Dkt. 22 (Roberts Dep. 31:24-37:12). But Parish expressed his concern that CTI's plan would generate a lot of extra heat inside the facility. Dkt. 23 (Parish Dep. 19:19-21:5). Specifically, Parish told CTI's representative that for "the system to function properly, [CTI] had to be able to ensure that we had a temperature at or below 110 degrees at all times." *Id.* (Parish Dep. 21:3-5). CTI's project manager also received an email from Global Finishing's salesman, who indicated that putting the air handling units inside the building would generate a lot of heat. Dkt. 26 (Becker Dep. 61:6-63:12). Based on CTI's decision to proceed with the project with the air handling units placed indoors, a jury could infer that the parties understood that CTI (or AGCO) would be responsible for managing the climate inside the facility.

Another relevant pre-contract conversation occurred in April 2012, during a meeting between CTI, Global Finishing, WHESCO, and others. During the meeting, CTI's lead project manager indicated that CTI had previously taken air handling units that were typically used outdoors and installed them indoors. Dkt. 23 (Parish Dep. 25:25-27:25). CTI disputes that it had ever installed the specific air handling units that are at issue in this case indoors. Dkt. 51, at 2. But from CTI's representations about having experience with other units, a jury could infer that the parties intended for CTI or AGCO to bear responsibility for maintaining the temperatures inside the facility. Indeed, it would have been odd for Global

15

Finishing to provide climate control for the entire building when its role in the project was limited to constructing the EV room.

Post-contract email exchanges also support the inference that the parties did not intend for Global Finishing to control the temperatures around the EV room. Global Finishing's project manager explicitly stated in his August 2012 email "that it is the design responsibility of CTI/AGCO to keep the ambient temperatures in this area around the AHU below the maximum design temperatures to achieve proper performance." Dkt. 44-12, at 2. CTI accepted the concept designs that Global Finishing's project manager attached to this email. Dkt. 35-5, at 1.[2] A month later, Global Finishing's project manager contacted CTI to express similar concerns about the excess heat. *See* Dkt. 44-13, at 2. This evidence further supports the inference that the parties intended for CTI or AGCO to control temperatures inside the facility.

To be clear, CTI has adduced evidence that the contract required Global Finishing to account for any increase in heat that its design created. But because this is CTI's motion for summary judgment, the inquiry is whether there is evidence in the record that could lead a jury to find in favor of the non-moving party, Global Finishing. It will be up to the jury to review the competing evidence, evaluate the credibility of relevant witnesses, and determine what the parties actually intended. *See Mgmt. Comput. Servs., Inc.*, 557 N.W.2d at 75. At this point, there are genuine disputes of fact with regard to whether the EV room that Global

---

[2] Under the contract, CTI's acceptance of these drawings did not release Global Finishing from delivering an EV room that met the specifications. Dkt. 8-1, § 5.1. But CTI's acceptance without comment on Global Finishing's project manager's statements about excess heat is evidence that the parties understood their contract to require CTI to manage the climate around the EV room.

Finishing delivered met the specifications in the parties' contract. The court must therefore deny CTI's motion for summary judgment on its first breach of contract claim.

CTI's second breach of contract claim alleges that the EV room did not comply with applicable codes and standards. In particular, CTI contends that the EV room did not comply with: (1) the National Fire Protection Association (NFPA) 70, also known as the National Electrical Code; (2) International Mechanical Code (IMC) Section 304, Paragraph 304.1; and (3) Carrier's instructions for installing the air handling units. Dkt. 32, at 11-12.

CTI relies on McGinnis's expert opinions to support these contentions, *see* Dkt. 33, ¶¶ 60, 61, 64, which raises two issues concerning the summary judgment record. First, CTI relies on McGinnis's second expert report to support its contention that the EV room did not comply with the IMC. *Id.* ¶ 64. But McGinnis's second report was not a proper supplement under Rule 26(e), and the court has excluded that report. Thus, CTI has not identified admissible evidence to support this contention, and summary judgment is not appropriate on this claim as it relates to violations of the IMC.[3] Second, Global Finishing disputes that it violated the NFPA principally on the grounds that it has not had the opportunity to depose McGinnis and evaluate his opinions. *See* Dkt. 40, at 16. As the court has explained, however, this excuse is a non-starter. Global Finishing had adequate time to depose McGinnis and challenge his expert opinions.

Global Finishing also contends that Parish's deposition testimony, even as a lay witness, is sufficient to create a genuine dispute of fact about whether Global Finishing

---

[3] CTI also relies on McGinnis's second report for the conclusion that the EV room did not comply with the NFPA. Dkt. 33, ¶ 60. But McGinnis offered opinions about the NFPA in his first report as well. *See* Dkt. 29, at 2, 8, 9. Thus, there is admissible evidence—other than the improper supplement—to support CTI's contentions regarding the NFPA.

complied with the NFPA's requirements. Maybe. But Parish's exclusion as an expert witness raises questions about the permissible scope of his testimony. At his deposition, Parish stated that, to his knowledge, Global Finishing's design met all of the applicable requirements, and that he was not aware of any code violations. Dkt. 23 (Parish Dep. 111:23-112:4). Yet Parish also stated that he never saw the specifications for the EV room, nor was he involved with installing the air handling units. *Id.* (Parish Dep. 44:16-25, 111:18). Thus, it is not clear which of Parish's opinions, if any, would be based on his perception and not on scientific, technical, or other specialized knowledge. *See* Fed. R. Evid. 701. At this point, the parties have not squarely addressed the scope of Parish's testimony, and the court will expect this issue to be presented in a motion in limine.

Regardless, CTI is not entitled to summary judgment on its second breach of contract claim for reasons unrelated to the expert evidence. "[T]o be recoverable in a contract claim, damages have to flow from the breach." *United Concrete & Const., Inc. v. Red-D-Mix Concrete, Inc.*, 2013 WI 72, ¶ 54, 349 Wis. 2d 587, 836 N.W.2d 807 (internal citations and quotation marks omitted); *see also Thorp Sales Corp. v. Gyuro Grading Co.*, 111 Wis. 2d 431, 331 N.W.2d 342, 346 (1983) ("[T]he award of damages for a breach of contract should compensate an injured party for losses that necessarily flow from the breach."). But even assuming for purposes of summary judgment that Global Finishing breached the parties' contract by failing to comply with Carrier's installation instructions—therefore violating the NFPA, which requires that equipment be installed and used in accordance with its labeling—CTI has not established that this breach caused damage.

This case is principally about who was responsible for maintaining the temperatures around the air handling units. The parties agree that the units did not work properly because

18

of overheating. Dkt. 40, at 21. The Carrier technician who visited the AGCO facility after the air handling units failed reported that the units were recirculating condenser air and that the temperature around the units was 159°F. Dkt. 35-20, at 7. But CTI has not demonstrated that even with proper temperature regulation, the air handling units would have failed just because Global Finishing did not install them in a way that was consistent with Carrier's instructions.

As the parties have presented this case at summary judgment, CTI's damages flowed from Global Finishing allegedly breaching the parties' contract by failing to ensure that the ambient temperatures around the air handling units stayed within the range identified in the specification. Global Finishing's non-compliance with Carrier's installation instructions and the NFPA may have contributed to the problem. But the record does not conclusively establish that this aspect of the installation independently caused the air handling units to fail. This claim goes hand-in-hand with CTI's first breach of contract claim: a jury will ultimately have to resolve both of them.

2. **CTI's breach of warranty claims**

Under the parties' contract, Global Finishing warranted that the EV room would conform to the technical specifications, be fit for its intended purpose, be free from defect, and comply with all applicable laws. Dkt. 8-1, § 12. Global Finishing also agreed that for 24 months, it would correct defects with the EV room to ensure compliance with the specification. *Id.* CTI contends that Global Finishing breached these warranties by delivering a non-compliant EV room and then refusing to correct the problems with the air handling units that arose after installation. Dkt. 32, at 12. This claim is intertwined with CTI's breach of contract claims: if the EV room satisfied the technical specifications, then there were no

19

defects for Global Finishing to cure. Thus, CTI is not entitled to summary judgment on its breach of warranty claims because it has not established as a matter of law that Global Finishing delivered a deficient or non-conforming EV room.

ORDER

IT IS ORDERED that:

1. Plaintiff CTI Systems, S.A.'s motion for summary judgment, Dkt. 31, is DENIED.

2. Plaintiff's motion to strike, Dkt. 47, is GRANTED. Defendant Global Finishing Solutions, LLC's expert disclosure, Dkt. 37, is STRICKEN, and Mark Parish will not be allowed to testify as an expert in this case.

3. Plaintiff's supplemental expert report, Dkt. 30, is STRICKEN, and Daniel McGinnis's expert testimony will be limited to the opinions that he disclosed in his first expert report.

Entered January 8, 2016.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge