IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CTI SYSTEMS, S.A.,

                          Plaintiff,

    v.

GLOBAL FINISHING SOLUTIONS, LLC,

                          Defendant.

OPINION & ORDER

14-cv-744-jdp

---

This breach of contract case between plaintiff CTI Systems, S.A. and defendant Global Finishing Solutions, LLC went to trial in February 2016. The parties' dispute arises out of a failure in the HVAC system for an environmental room (EV room) that Global Finishing constructed for CTI. The primary issue was whether, under the parties' contract, Global Finishing was responsible for that failure. A jury found in Global Finishing's favor, concluding that it did not breach the parties' contract.

Two post-trial motions are before the court. First, Global Finishing moves for its costs and attorney fees, pursuant to Federal Rules of Civil Procedure 54 and 68. Dkt. 118. The court will grant this motion in part and award Global Finishing some of its costs, but not its attorney fees. Second, CTI moves for judgment as a matter of law or, alternatively, for a new trial, pursuant to Rules 50 and 59. Dkt. 122. The court will deny this motion.

BACKGROUND

The evidence at trial substantially confirmed the facts that the court recounted in it its summary judgment decision. Dkt. 59. To summarize:

AGCO Corporation—not a party to this suit—hired CTI to construct a paint workshop in Hesston, Kansas. Part of the project required building an EV room in which to prepare metal parts for a powder coating process. CTI contracted this aspect of the project out to Global Finishing, a company with expertise in EV room installations.

This case is about the HVAC system that Global Finishing selected for the EV room; specifically, the air handling units, which overheated and stopped working sometime after Global Finishing installed them. Global Finishing's initial plan was to place these units on the roof of the AGCO facility that CTI was constructing. CTI rejected this proposal, indicating that it wanted the air handling units to be installed inside the facility (but outside the EV room). CTI's plan was to use the heat that the air handling units generated to help cure the finish on parts in other locations at the facility. Global Finishing warned CTI that this plan would create a lot of heat. But CTI insisted on a design that had the air handling units inside the facility, and so Global Finishing submitted a quote for such a design.

The parties incorporated a technical specification for the EV room into their contract. CTI (or AGCO) would provide a power supply point, water, and a drain; Global Finishing would supply all other equipment and installation materials. The contract also contained two provisions that are pertinent to this case. The first provision required the HVAC system to be installed outside the EV room but inside the facility:

### 3. HVAC units

The HVAC units are equipped with all necessary equipment to meet the climate conditions described in the Performance criteria/ local conditions in KS. The heating and de-humidification should be done electrically. The units are installed on a steel structure[] outside of the EV-room, but inside of the building. The access to the platform to be considered accordingly in order to do the maintenance work required.

2

Dkt. 8-2, § 3. The second pertinent provision described the environmental conditions in which the EV room would operate:

### 5. Process/Environmental Parameter

Heat loads to be considered

- Powder booth grey             275.000 BTU/hour
- Powder booth black            275.000 BTU/hour
- Powder booth multicolor       350.000 BTU/hour

- 3 ware loads at the time
      Velocity Load:            0,1-4 m/min
      Weight Load:              2200 pounds per ware load
      Surface:                  300 sqft, p

      Approx. Temperature Metal entering Room:        Temperature 122°F

- heat load of 2 operators in the booth
- heat load of lighting
- heat load because of the room design (wall, doors,..)

Climatic condition outside the EV Room

Temperature Inside:  min. 55°F
                     [m]ax. 110°F

Humidity:            min. 20%
                     max. 99.7%

*Id.* § 5.

As Global Finishing's project team started designing and constructing the EV room, one of its project managers expressed concerns to CTI about the heat that the air handing units would generate. On at least two different occasions, the project manager warned that the heat buildup could cause issues if CTI or AGCO did not provide appropriate ventilation and keep the temperatures around the air handling units at or below 110°F. CTI did not take steps to address these concerns.

Global Finishing delivered the completed EV room, and CTI paid for it in full. But the EV room began experiencing problems shortly after AGCO started using it. The problems were with the air handling units, and they were due to poor ventilation and high ambient temperatures. CTI asked Global Finishing to fix the problem, but Global Finishing refused to do so without compensation. CTI undertook the repair itself, eventually installing air handling units outside the facility, at a cost of $394,320.91. When Global Finishing refused to reimburse CTI for these expenses, CTI filed suit in this court alleging state law claims for breach of contract and breach of warranty.

The court denied CTI's motion for summary judgment, and the case proceeded to trial. A jury concluded that Global Finishing did not breach its contract with CTI. The court entered judgment in favor of Global Finishing on March 3, 2016.

ANALYSIS

Both sides have filed post-trial motions: CTI seeks judgment as a matter of law or a new trial, Dkt. 122, and Global Finishing seeks its fees and costs, Dkt. 118.

## A.  CTI's motion for judgment as a matter of law

At the close of Global Finishing's case, CTI moved for a directed verdict, pursuant to Rule 50(a). Tr. 3p, at 7:10.[1] The court deferred ruling on the motion, *id.* at 9:9-16, and CTI now renews it, pursuant to Rule 50(b). Dkt. 122. CTI presents two arguments in support of its motion, neither of which is persuasive. The court will therefore deny CTI's motion.

---

[1] Citations to trial transcripts are by day, session, page, and line. Thus, "Tr. 3p, at 7:10," refers to the transcript from the third day of trial, afternoon session, page 7, line 10. The parties have not ordered transcripts in this case, and so the court will cite to uncertified (i.e., rough) versions.

First, CTI contends that the court incorrectly concluded at summary judgment that the parties' contract was ambiguous. According to CTI, the contract unambiguously required Global Finishing to design a system that would work within the specified environmental parameters, and so the court should have enforced the contract as written and entered judgment in CTI's favor. CTI rehashes some of its rejected summary judgment arguments and asserts that "[w]ith the benefit of the trial testimony, the Court should review and revise its finding of ambiguity." *Id.* at 3. But these arguments did not entitle CTI to summary judgment before trial, and they do not now entitle CTI to judgment as a matter of law after trial.

Under Wisconsin law, "[a] contract provision is ambiguous if it is fairly susceptible of more than one construction." *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 2015 WI 65, ¶ 36, 363 Wis. 2d 699, 866 N.W.2d 679 (internal citations and quotation marks omitted). At summary judgment, the court concluded that the parties' contract did not specify who was to maintain the ambient temperatures around the air handling units. Dkt. 59, at 13-14. Thus, the ambiguity was whether Global Finishing merely had to design an EV room that would work in temperatures at or below 110°F, or whether it had to design an EV room that would work in those temperatures *and not increase them*. Contrary to CTI's contention, either construction would be reasonable. The evidence at trial does not require the court to revisit its earlier conclusion that the contract is ambiguous, and CTI is not entitled to judgment as a matter of law on this ground.

Second, CTI argues that even if the contract is ambiguous, the evidence at trial did not support the jury's verdict. This is a tall order. "In deciding a Rule 50 motion, the court construes the evidence strictly in favor of the party who prevailed before the jury and

examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012). The court reviews the entire record but does not reweigh the evidence, make credibility determinations, or consider evidence favorable to the moving party that the jury was not required to believe. *Id.* Thus, CTI would be entitled to judgment as a matter of law only if the jury did not have a "legally sufficient evidentiary basis" to find in Global Finishing's favor. *Id.*; Fed. R. Civ. P. 50(a)(1).

According to CTI, the evidence at trial established that Global Finishing breached the parties' contract by: (1) failing to design a system that would function properly within the range of temperatures listed in the specification; and (2) failing to follow various manufacturer instructions and professional codes when it installed the air handling units. Dkt. 122, at 3-5.

As to the first alleged breach, the jury's primary job in this case was to determine what the parties' contract required of Global Finishing. Based on the verdict, the jury concluded that the parties meant for Global Finishing to design a system that would function in temperatures between 55°F and 110°F. Evidence at trial confirmed that the air handling units initially worked after Global Finishing installed them in early 2013, when temperatures were within the specified range. *See, e.g.*, Tr. 2p, at 104. When the units failed, however, ambient temperatures were well above 110°F.

The jury was entitled to credit the evidence at trial establishing that the parties intended for CTI to handle issues with ambient heat or circulation. For example, during the planning stages of the project, Global Finishing personnel repeatedly expressed concerns to CTI about mounting the air handling units indoors, explaining that they could malfunction if

6

CTI or ACGO did not have a plan to ensure proper ventilation and temperature regulation. *See, e.g.*, Def.'s Ex. 521, 522, 528, 530. And Ludwig DeWald, CTI's branch manager, signed a sworn declaration confirming that during a planning meeting with Global Finishing personnel, he indicated that CTI would be responsible for keeping the temperature in the ACGO facility under 110°F. Def.'s Ex. 569. This evidence provided a sufficient basis for the jury's conclusion that Global Finishing did not breach the parties' contract with regard to the EV room that it designed.

As for the more "technical" breaches, CTI contends that Global Finishing failed to comply with manufacturer instructions and professional codes when installing the air handling units that it chose for the project. For example, the units' instructions required that they have at least six feet of clearance on all sides. Yet Global Finishing installed the units less than six feet from the ceiling of the AGCO facility. And the units themselves were labeled for outdoor use only, which Global Finishing did not disclose to CTI.

CTI's theory of the case was that Global Finishing could have selected indoor units or at least found other outdoor units to install without violating the manufacturer's installation instructions. But Global Finishing argued to the jury that CTI was aware of the potential heat issues, agreed to account for them, and wanted to redirect that heat to other areas in the facility. Evidence at trial supported these arguments, and the jury was entitled to accept them. For example, Global Finishing's early quotes to CTI included plans to mount the air handling units on the roof of the AGCO facility. Def.'s Ex. 565. At CTI's insistence, however, Global Finishing revised these quotes to provide that the air handling units would be on top of the EV room but inside the facility. Def.'s Ex. 566. And CTI persisted with its plan, even after Global Finishing personnel warned of the dangers of putting the units inside. Def.'s

Ex. 521, 522. This evidence supported the jury's conclusion that Global Finishing did not breach the "technical" aspects of the parties' contract.

CTI has not demonstrated that the jury's verdict lacked a "legally sufficient evidentiary basis." The court will deny CTI's motion for judgment as a matter of law.

## B. CTI's motion for a new trial

As an alternative to judgment as a matter of law, CTI moves for a new trial, pursuant to Rule 59. "A court may only order a new trial if the jury's verdict is against the manifest weight of the evidence, or if for other reasons the trial was not fair to the moving party." *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (citations, internal quotation marks, and alterations omitted). CTI presents two independent grounds for a new trial, neither of which is persuasive.

First, CTI contends that the jury did not answer special verdict questions about causation and damages (the other elements of CTI's breach of contract claim), and about the issue of waiver (Global Finishing's affirmative defense).[2] If the court were to conclude that no reasonable jury could have failed to find that Global Finishing breached the parties' contract (i.e., if the court were to grant CTI's Rule 50(b) motion), then a new trial would be necessary to address these questions. But as explained above, there was sufficient evidence to support the jury's conclusion that Global Finishing did not breach the parties' contract. Thus, there is no need for a new trial on any other elements or affirmative defenses because the jury's verdict disposed of CTI's breach of contract claim.

---

[2] The special verdict form instructed the jury to not answer these questions if it found that Global Finishing did not breach its contract with CTI. Dkt. 116, at 1.

Second, CTI argues that the court erred in refusing to allow lay opinion testimony from two of its witnesses: Larry Priddy and Doug Bare. Before trial, CTI argued that these witnesses should be allowed to offer "opinions based on [their] observations and work experience, but not on scientific or specialized expertise." Dkt. 99, at 2. Yet much of the testimony that CTI attempted to present consisted of opinions based on specialized or scientific knowledge. *See, e.g., id.* at 3-4. In other words, it was expert testimony, not lay opinion testimony. And because CTI did not disclose Priddy or Bare as experts, the court precluded these witnesses from offering expert testimony at trial.

CTI maintains that the excluded testimony from both witnesses was admissible as lay opinion testimony and that the court's evidentiary rulings were incorrect and prejudicial. But CTI misunderstands the type of lay opinion testimony that the Federal Rules of Evidence authorize. Some courts permit lay witnesses to testify to opinions that "are based on a combination of their personal observations of the incident in question and background information they acquired through earlier personal observations." 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 701.03[1] (2d ed. 2016). Examples of such testimony would include a business owner who opines on the value of his company or a homeowner who opinions on the value of her house. *Id.*; *see also United States v. Conn*, 297 F.3d 548, 554 n.2 (7th Cir. 2002).

Here, CTI wanted to stretch this principle to allow Priddy and Bare to offer opinions about the air handling units based on their observations and work experience. Specifically, Priddy and Bare would have testified that installing the units indoors was improper, that the space between the units and the ceiling was insufficient, and that the installation had to be corrected. Dkt. 122, at 8. These were expert opinions based on specialized or technical

9

knowledge; they were not lay opinions. Excluding them was consistent with Seventh Circuit precedent. *See, e.g., Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Int'l, Inc.*, 533 F.3d 555, 561 (7th Cir. 2008) ("Testimony based solely on a person's special training or experience is properly classified as expert testimony, and therefore it is not admissible under Rule 701. . . . Taylor's valuation attempt was based on his special experience in the tire industry, not on his personal knowledge of the goods in question; therefore, it falls within the purview of Rule 702." (citations omitted)); *Conn*, 297 F.3d at 554-55 ("Agent McCart's testimony was not based only on his observations; rather, the testimony was based on his accumulated expertise obtained through experience and training. He was asked to draw upon his accumulated knowledge and to provide information to the jury about the appropriate characterization of Mr. Conn's firearms. . . . Testimony of this nature is expert testimony."). CTI has not demonstrated that the court's evidentiary rulings regarding Priddy and Bare were incorrect. This is reason enough to deny CTI's motion for a new trial.

Even if the court had erroneously precluded Priddy and Bare from offering expert testimony, CTI would still not be entitled to a new trial. "A new trial is warranted only if the [decision to exclude evidence] has a substantial and injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice." *Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 440 (7th Cir. 2009). CTI contends that excluding Priddy and Bare's opinion testimony was prejudicial because these witnesses were "neutral, knowledgeable observers and inspectors of the project failure as a matter of fact, each of their observations was highly probative, beyond even similar observations by CTI witnesses or CTI's retained expert." Dkt. 122, at 8.

10

Other evidence established the "lay opinions" that Priddy and Bare would have offered. There was no dispute that Global Finishing installed outdoor-only units inside, that the units were less than six feet from the ceiling, and that CTI ultimately had to fix the problem by installing different units. A lack of evidence on these points is not what led the jury to find in Global Finishing's favor. More likely, it was the testimony from CTI's own employee (and others), who confirmed that: (1) Global Finishing expressly warned CTI about the dangers of installing air handling units indoors; (2) CTI pursued the idea anyway because it wanted to use the heat elsewhere in the AGCO facility; and (3) CTI indicated that it would manage the temperatures around the EV room. If anything, the excluded testimony was simply cumulative evidence that would have supported a theory that the jury ultimately rejected for other reasons. CTI has not demonstrated that the court's evidentiary rulings warrant a new trial.

## C.  Global Finishing's motion for costs and attorney fees

Global Finishing prevailed at trial and now seeks its costs and attorney fees, pursuant to Rules 54(d) and 68(d). Dkt. 118. But Global Finishing is entitled to only some of the costs that it has identified, and it is not entitled to any attorney fees. The court will therefore grant Global Finishing's motion only in part.

Global Finishing seeks $12,952.04 in costs. *Id.* ¶ 9; Dkt. 119-3. CTI first objects generally to any award of costs because Global Finishing did not demonstrate that its costs were necessary. "Any party seeking an award of costs carries the burden of showing that the requested costs were necessarily incurred and reasonable." *Trs. of Chi. Plastering Inst. Pension Tr. v. Cork Plastering Co.*, 570 F.3d 890, 906 (7th Cir. 2009). Global Finishing's counsel's conclusory declaration that the submitted spreadsheet accurately reflects the costs that his

11

client incurred, Dkt. 119, ¶¶ 4, 6, is a poor method for satisfying this requirement. But after reviewing Global Finishing's submissions, the court is persuaded that its identified costs were necessarily incurred in defending this case.

As for CTI's objections to some of Global Finishing's specific costs, the court agrees that they are not recoverable. Global Finishing seeks $5,035.45 in costs for legal research. But "computer research costs are more akin to awards under attorney's fees provisions than under costs. . . . In fact such costs are indeed to be considered attorney's fees." *Haroco, Inc. v. Am. Nat. Bank & Tr. Co. of Chi.*, 38 F.3d 1429, 1440 (7th Cir. 1994) (citations and internal quotation marks omitted). Likewise, Global Finishing cannot recover costs for postage or for its counsel's parking during depositions. *See Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1144 (7th Cir. 1994). Because CTI's objections are valid, and because Global Finishing does not respond to them in its reply brief, *see* Dkt. 121, the court will award Global Finishing only the recoverable costs, in the amount of $7,864.00.

Global Finishing also seeks its attorney fees, relying on an offer of judgment that it made to CTI, pursuant to Rule 68. Dkt. 119-1. CTI rejected the offer, and then did not prevail at trial. Thus, Global Finishing argues that it is entitled to its fees under Rule 68(d), which provides that "[i]f the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made."

The court will deny this aspect of Global Finishing's motion because CTI did not obtain a judgment that was "not more favorable than the unaccepted offer." In fact, CTI did not obtain *any* judgment because Global Finishing won the case. The Supreme Court and the Seventh Circuit have squarely addressed this situation, holding that Rule 68 "applies only to offers made by the defendant and only to judgments obtained by the plaintiff. It therefore is

12

simply inapplicable to this case because it was the defendant that obtained the judgment." *Delta Air Lines, Inc. v. August*, 450 U.S. 346, 352 (1981); *see also Tidemann v. Nadler Golf Car Sales, Inc.*, 224 F.3d 719, 726 (7th Cir. 2000) ("Rule 68 costs are available only when a plaintiff obtains judgment in her favor, but recovers less than the settlement offer. It does not apply to a case like this one, where the judgment is for the defendant.").

CTI cited *Delta Air Lines* in its opposition to Global Finishing's motion. *See* Dkt. 120, at 2-3. But rather than withdraw its request for attorney fees, Global Finishing's reply brief simply directed the court to the dissenting opinion in *Delta Air Lines*, which reasoned that a prevailing defendant could seek costs under Rule 68 because the losing plaintiff obtained a "decree and order from which an appeal lies." 450 U.S. at 370 (Rehnquist, J., dissenting). Global Finishing's argument is frivolous: the dissenting opinion in *Delta Air Lines* does not control the outcome of its request for fees. Rule 68(d) does not apply in this case because Global Finishing prevailed at trial. The court will therefore deny this aspect of Global Finishing's motion.

ORDER

IT IS ORDERED that:

1. Plaintiff CTI Systems, S.A.'s motion for judgment as a matter of law or, alternatively, for a new trial, Dkt. 122, is DENIED.

2. Defendant Global Finishing Solutions, LLC's motion for attorney fees and costs, Dkt. 118, is GRANTED in part and DENIED in part:

    a. Defendant is awarded its costs in the amount of $7,864.00.

    b. Defendant is not awarded any attorney fees.

Entered June 29, 2016.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

14